UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CR No.: 04-10098-WGY |
| ) | |
| v. ) | |
| ) | |
| CARMEN FIGUEROA, ) | |
|     Defendant ) | |

**DEFENDANT'S' MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS
RECORDINGS OF PRISON TELEPHONE CALLS**

**I. STATEMENT OF FACTS**

Manuel Mendes (hereinafter referred to as "Mendes") was incarcerated at the Plymouth County Correctional Facility (hereinafter referred to as "PCCF") on drug charges in or about May of 2002. Inmates of that facility may designate certain individuals to whom they would like to place collect telephone calls. After institutional review, these individuals are placed on the inmate's approved call list and entered into the telephone system. Each inmate is given an individualized pin number to use to initiate calls to those persons on their approved list (Aff. 1, ¶ 18ff). Carmen Figueroa, the mother of his children and his "significant other" was one of the people Mendes placed on his call list.

Inmates are told that their telephone calls are subject to monitoring and recording and each inmate is required to sign a form acknowledging that " . . . use of the inmate telephones will be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring, recording and call detail." (Aff.. 1, ¶18)

When a telephone call from an inmate is received, a taped introduction is usually heard stating that this call is subject to monitoring and recording, custom calling features are not allowed, to accept this call press 0.  If 0 is pressed the electronic voice says "go ahead with your call" and the connection is made. This method was the only method by which Mendes and the non attorneys on his call list could communicate orally.

Between May 2002 and December 11, 2002  when Mendes' bother Daniel was shot in the head and killed, there is no indication that any of Mendes calls were monitored in real time by prison officials or that any of the recordings of his calls were listened to by prison authorities for any purpose by prison personnel.[1]

The first time (apparently) that any of Mendes' calls were listened to was when "law enforcement officials", without a warrant and without individualized consent from either the inmate or the recipients of his calls, gained access to the computerized system and listened to recordings of Mendes' past calls in an attempt to gain information about his brother Daniel's death.  The police had information that Daniel had assumed leadership of the drug organization when Mendes went to jail.  While conducting their criminal investigation, the "law enforcement officials" heard a number of telephone calls[2] from which they concluded that Mendes was  continuing to operate his drug business while incarcerated.

---

[1] According to PCCF personnel, the recording system in use at the jail in 2002-2003 retained the calls for only 90 days.  After 90 days, the recordings were erased and the equipment reused.  In April of 2004 a digital system was installed and the recordings of calls are maintained indefinitely.

[2] See, ¶¶ 22-23, 40-76 of Sean E. Balcom's Affidavit in Support of Application for Authorization to Intercept Wire Communications.

That information was provided to or obtained directly by the DEA Task Force[3]. As a result, task force agents, without obtaining a search warrant or any kind of court approval, issued administrative subpoenas for the contents of prison telephone calls, which were immediately honored by the prison, and obtained tapes of those calls. They listened to a number of Mendes' calls to Carmen Figueroa, the mother of his children, and others.

The information they the obtained from their warrantless access to Mendes' and Figueroa's prison telephone conversations was distilled and then presented to the Court in S/A Balcom's affidavit to establish probable cause for the electronic surveillance of four telephones:

"a.  the telephone assigned call number (508) 759-3402 and subscribed to in the name and address of Carmen Figueroa, 90 Sandwich Rd, Ap. 9-C, Bourne, Massachusetts with service provided by Verizon (hereinafter "Target Phone #1").

b.  the cellular telephone assigned cal number (774) 353-7360 and IMSI # 316010011137274 and UFMI 180*83*6705 and subscribed to in the name and address of Carmen Figueroa, 90 Sandwich Rd, Ap. 9-C, Bourne, Massachusetts, with service commencing o or around May 3, 2003, and provided by Nextel, (hereinafter "Target Phone #2").

c.  the cellular telephone assigned call number (508) 400-2957 and

---

[3] Defendant cannot discern whether the "law enforcement officers" investigating the homicide of Daniel Mendes were members of the drug task force of which TFA Balcom was a part.

      bearing IMSI # 31601000496017, and UFMI # 180*71*2633 and subscribed to in the name and address of Chris Custer, 18 Murphy Rd., Hyannis, Massachusetts, 02601-2882, with service commencing on or around February 21, 2001, and provided by Nextel (hereinafter "Target Phone #3").

d.    the cellular telephone assigned call number (508) 292-7708 and bearing IMSI # 310160701462377, and subscribed to in the name and address of Carmen Figueroa, 90 Sandwich Rd, Ap. 9-C, Bourne, Massachusetts 02532-3624 with service commencing on or around June 18, 2002, and provided by T Mobile, U.S.A. (hereinafter "Target Phone #4)."

(Application for the Interception of Wire/Oral Communications dated January 29, 2004, 04MBD10035).

Based primarily on the intercepted prison calls, the electronic surveillance application was approved. The government intends to use the contents of the prison calls and the electronic surveillance as .its primary evidence in the prosecution of this case.

## II.  ARGUMENT

**The Unfettered Access of Law Enforcement Agents to Recorded Prison Calls Without Judicial Process and a Showing of Cause Violated Defendants' Constitutional and Statutory Rights Requiring Suppression of the Contents of the Calls and Any Fruits of the Calls**

This case presents an issue of first impression in this circuit: whether law enforcement agents without warrant or other judicial process may access the contents

of inmate telephone calls for criminal investigative purposes unrelated to prison security, where those calls had been previously recorded but not listened to by prison personnel in accordance with an established policy. Defendants submit that the answer to this question is and should be no for the reasons set forth herein.

### A. The Warrantless Interception of Prison Telephone Calls Violates the Fourth Amendment the United States Constitution and Title III U.S.C. Sec. 2110 Et. Seq.

In <u>Katz v. United States</u>, 389US347 (1967), the Supreme Court recognized that even where there is no physical intrusion into an area protected by the fourth amendment, the prohibition against unreasonable searches and seizures applies to the interception of wire and oral communications. Shortly thereafter Congress enacted a carefully constructed statue specifically designed to permit the interception of wire and oral communications consistent with the protections afforded by the fourth amendment: Title III of the <u>Organized Crime Control And Safe Streets Act</u> of 1968 (Title 18 <u>U.S.C</u>. sec 2110 et seq.) That statute forbids the willful interception of wire and oral communications, including telephones conversations, without judicial authorization pursuant to that statute. <u>United States v. Green</u> 842 <u>F.Supp</u> 68 (   1994). [4]. Title III clearly prohibition applies to prison monitoring of inmate telephone calls. <u>United States v. Paul</u>, 614 F.2d 115, 117 (6th Cir.), *cert denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980) <u>Campiti v. Walonis</u>, 611 F.2d 387, 392 (1st Cir. 1979); <u>Crooker v. United States Department of Justice</u>, 497 F.Supp. 500, 502 (D.CONN 1980); *see also*

---

[4] The capital Senate capital report declares that Title III created a flat ban on all unauthorized electronic surveillance: quote Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specific types of major crimes after obtaining a court order. . . . " S. Rep. No.1097, reprinted in 2 U.S. Code Cong.& Admin News 1968, at p 2113.

United States v. Figueroa, 757 F.2d. 466, 472 (2d Cir. 1985) (assuming Title III procedures for wiretap order apply to prison surveillance).

In attempting to justify the warrantless interception of the contents of prison telephone calls and the use of the contents of those calls at a trial, the government usually relies upon two statutory exceptions to the Title III court order requirement: (1) The one-party consent exception contained in 18 U.S.C. § 2511 (2) ( c ) and; (2) the law enforcement exception found in 18 U.S.C. §2510 (5)(a)( ii).

### 1.   **The Consent Exception**

Title 18 U.S.C. § 2511 (2) ( c ) provides as follows: It shall be unlawful under this chapter for a person acting under color of law to intercept a wire, oral or electronic communication, where such person is a party to the communication or one of the par5ties of the communication has given prior consent to such interception.

Although a number of Courts[5] have rejected motion to suppress prison telephone calls, holding that the inmate receives ample notice that his / her calls will be monitored and recorded and makes calls in spite of this warning he / she has implicitly consented to the monitoring and recording of his calls and therefore the single party consent exception applies, defendant submits that a contrary view is more persuasive. In United States v. Footman, 33 F. Supp. 2d 60 (D. Mass 1988), Judge Gertner rejected the government's argument that a prisoner consents to the monitoring and recording of his telephone calls simply by using the telephone. Noting the seventh circuit concerns about implying consent merely because the prisoner has notice of the monitoring , (acquiescence does not mean implied consent), United

---

[5] *See, e.g.:* United States v. Amen, 831 F3d 373 (2nd Cir. 1987) and United States v. Workman, 80 F3d 688 (2nd Cir. 1996);

States v. Daniels, 902 F2d 1238, 1244-1245 (7th Cir. 1990), the Court doubted that a prisoner can meaningfully consent to being overheard where the failure to consent means absolutely no access to the telephone. Judge Gertner then went on to justify the warrantless interception by suggesting (without extensive analysis) that the recipient of the phone calls, being free and having been notified of the monitoring and recording provided the consent necessary for the exception.[6] Consent should not be inferred from the act of accepting the telephone call for the same reason it should not be inferred from the act of placing the call. Although the recipient of a prison of a prison phone calls is free not to accept the call, the fact is that the telephone is the only verbal contact that the recipient of the telephone call can have with the prisoner except for limited visitation which is often difficult especially for people with small children and a distance to travel. There is no other way that a person on a prisoner's pin list can arrange for unmonitored / unrecorded. In the instant case, Ms. Figueroa was the mother of Manuel Mendes' children and, in practical effect his "wife". To conclude that she had some alternative to receiving Manuel Mendes' telephone calls is disingenuous. She is no freer than he with respect to the telephone - if she wants to speak with him, even about sensitive family matters, she must accept the call or forfeit the communication. There is, thus, no distinction which would permit the inference of consent for the call recipient and reject it for the prisoner. Defendant therefore submits that this Court should reject the consent exception as a basis for justifying the use of monitored and recorded prison calls at a criminal trial because the consent

---

[6] The introductory recording played to recipients of prison calls from Plymouth County Correctional Facility states that the conversations are "subject to monitoring and recording" not every calls is in fact monitored and recorded.

allegedly obtained to the monitoring and recording is a legal fiction.

Moreover, consent is not an all or nothing proposition. A person giving consent may limit the scope of the consent given. Likewise, the scope of the consent must be determined by the Court from the totality of circumstances. Here, if consent to the monitoring and recording of the prison calls is to be inferred, the Court should limit the consent to access by prison personnel for prison purposes only and to law enforcement officials fishing for information. The warning given in the instant case certainly did not inform either the caller or the recipient of the telephone call that law enforcement officials would have access to the recordings absent a search warrant or other court order. In either case the consent exception does not apply to the circumstances of this case.

2. **The Law Enforcement Exception**

Title 18 U.S.C. § 2510 (5)(a) provides: means any device or apparatus which can be used to intercept wire, oral or electronic communication other than - (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (iii) being used by a provider or wire or electronic communication service in the ordinary course of its business or by an investigative or law enforcement officer in the ordinary course of his duties.

Defendant submits that this exception does not apply in the circumstances of this case. Here, there is no evidence that corrections officials even monitored the Mendes-Figueroa telephone calls in real time or listened to any of the recordings of there calls. The first accessing of the contents of the calls was by police officials who were provided with recordings in order to determine whether Mendes has any

knowledge of his brother's murder - a purpose totally unrelated to penological concerns. In Footman, supra, the judge rejected the government's argument that the law enforcement exception applied, stating "[ I am not ] willing to extend the law enforcement exception to allow law enforcement officers and not simply correctional officers to regularly probe inmate conversations." United States v. Footman, supra, 33 F. Supp. 2d at 64. This Court should likewise decline to extend the exception to encompass the circumstances of this case.

Based upon the foregoing analysis the warrantless seizure and accessing of the prison recordings violates the provision of the Title III and the contents of such conversations should be suppressed.

### B.   The Police Access To the Prison Tapes Without Court Approval Violated Defendant's Constitutional Rights

In addition to defendants rights under the Fourth Amendment and Title III Mendes and Figueroa had a constitutional right of privacy which was violated in this case when law enforcement officials, for investigative purposes, accessed the audiotapes of their prison telephone conversations without a warrant or prior court approval. In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678 )1965 and in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705 (1973)  the Supreme Court recognized the right to privacy as an independent constitutional right which may be impinged upon only upon a showing of compelling government interest". Id.

While various courts have held that the privacy rights of prisoners must, to some degree, yield to the security needs of prison officials to keep inmates securely confined, to enforce prison rules and to keep them safe from one another, it is well-

established that prisoners do not lose all constitutional rights once incarcerated. <u>Bell v Wolfish</u>, 441 U.S. 520 (1979 ).  Specifically, the right to privacy continues to exist in prison to the extent that the right is not fundamentally inconsistent with the nature of imprisonment itself and does not interfere with reasonable, legitimate prison regulations. <u>Olone v. Estate of Shabazz</u>, 482 U.S. 342 (1987).

While correction officials may be able to justify the monitoring and recording of outgoing telephone calls from prisoners to individuals on their approved call list on prison security grounds, defendants submit that to the extent that these calls are not contemporaneously monitored and the recordings remain un-listened to by prison officials for any legitimate institutional purpose, the inmates and those they call have a residual privacy interest in the contents of the tapes. They have a reasonable expectation that those tapes will not be accessed by law enforcement officials(or anyone other than prison officials for prison purposes) without a search warrant or some other judicial process which is based upon a showing of probable cause to believe that relevant information is contained on the recordings.[7]

That parties to prison telephone calls may be held to implicitly consent to monitoring and recording of those calls does not extinguish all privacy interests in the contents of the conversations.   Such implied consent is limited to prison access to the conversations by persons acting in accordance with prison regulations.  Law

---

[7] This is not a situation where, during an administrative monitoring of calls by prison personnel, evidence of a past, present, or future crime is discovered and referred to a law-enforcement organization for investigation and prosecution  Here, police, while investigating the murder of Daniel Mendez were provided access to Mendez recordings in order to rummage around in Mendes' tape recorded conversations to see what he knew or may have heard about the murder.  Such access did not have a prison related purpose and was thus unrelated to the reason for the recordings.

enforcement officials should have no more right to freely access these conversations without court process than they do to participate in the monitoring of service quality control checks of communications providers pursuant to 18 U.S.C. § 2511 (2)(a)(I). Simply because quality control checks are permitted as an exception to Title III and are implicitly consented to as a legitimate service provider function by the general public, telephone users do not forfeit their reasonable expectation of privacy in the contents of the telephone calls thus monitored. If such were the case, the consent exception to Title III would swallow its purpose: to protect the privacy of telephone communication from intrusion without court supervision.

Even the prisons which record and monitor the calls recognize at least a diminished privacy interest in them as they do not permit access to the recordings by the press, the public, the participants to the conversations or their attorneys without prior court approval. It is apparently only law enforcement which can obtain unchallenged access to the recordings. (*See*, note 9, *supra*).

In United States v. Noriega, 764 F. Supp. 1480, (S.D. Fla. 1991) Judge Hoevler considered a motion to dismiss the indictment against Noriega due to the monitoring, and the accessing of his prison calls to his attorneys by law enforcement agents involved in the prosecution of his case. In denying the motion to dismiss, [8] the judge determined that the prison had adequately notified Noriega that his calls would be monitored and recorded, gave him an alternative method of making private, non monitored, attorney calls and held that his continued use of the telephone under those

---

[8] Suppression of the contents of the calls was not one of the remedies asked for because the prosecution, after mucking around in the contents of the calls determined that they would not seek to introduce any of them. Id.

circumstances constituted consent to the monitoring and recording. Having made that determination, the Court held that the actions of the prosecution in reviewing his recorded calls[9] did not sufficiently interfere with the attorney-client privilege and / or the relationship to warrant the extreme remedy of dismissal of the charges.

After drawing these conclusions, the Court went on to discuss the manner in which the prison tapes were obtained from the prison by the prosecution team, and the propriety of that method. In Noriega, the prosecutor obtained the tapes by serving a Rule 17 subpoena duces tecum on the prison record keeper. These subpoenas misrepresented that the recordings were being sought for specific court hearings, when, in fact, no such hearings were held on the dates indicated. The only reason for the use of the subpoena was so that the government could obtain the tapes for investigative / discovery purposes before trial. The Court held that the government's actions were improper and held that trial subpoenas cannot be used to obtain a defendant's prison recorded conversations prior to the time they are to be offered into evidence unless leave of court is obtained. Id. at 1494.

Significantly, both the prosecutor and the Court appeared to recognize that some sort of court order is required before prison tapes may be obtained and examined for investigative purposes by non-prison personnel for investigative purposes. Otherwise, as in the present case, the prosecutor's agents would have simply gone to the prison (there M.C.C. Miami) and demanded to listen to the tapes and make duplicates of them or have issued administrative subpoenas. By inference,

---

[9] The prosecution attempted to segregate the true attorney calls from other outgoing calls so as allegedly not to gain an unfair advantage by overhearing trial strategy or the like. Id.

the Court appears to have recognized the difference between prison personnel monitoring a conversation or listening to a recorded conversation in the ordinary course, discovering evidence of a crime and turning that evidence over to law enforcement officials and law enforcement officials seeking access to pre-recorded calls to see if they can find out information helpful to their investigation. Noriega suggests that at least the latter needs some form of court approval to obtain and listen to prison tapes, so that the prosecutor of a particular case cannot rummage through the phone call recordings hoping to find something useful, criminal or both.[10]

In Ms. Figueroa's case, there is, no evidence that prison officials either monitored the Mendes calls or listened to the recordings of his conversations . The first individuals to access the prison tapes were police officers investigating the murder of Manuel Mendes' brother. They did not have a search warrant, or other form of court order requiring a demonstration of cause to believe they would find relevant information in the calls they accessed.  They informed the task force of their discoveries and the task force issued administrative subpoenas for the materials,

---

[10] Judge Hoevler wrote: "While it is generally assumed that courts can protect against abuse through rulings on motions to quash or modify, See 2 Wright Federal Practice and Procedure: Criminal 2d § 274 at 154-55, this in turn assumes that the recipient of the subpoena has some interest or incentive in filing such a motion. Yet it is wishful thinking to expect that prison officials will either oppose a government-requested subpoena which implicates an incarcerated defendant's interests or else enable the defendant to file his own motion to quash by notifying him that such subpoenas have been issued. If anything, the coinciding interests of prosecutors and prison authorities in law enforcement renders these subpoenas mere formalities and all but guarantees that prosecutorial overreaching such as the present here will go unchecked, a reality which must have been appreciated by the prosecution in this case and which should have made manifest the need for prior court authorization. Given the potential for abuse apparent to the court, it is clear that the limitation on advance production of subpoenaed materials must be strictly enforced particularly in this context." Id. at 1493-1494.

which subpoenas were complied with without question. Because there was no warrant or court order authorizing the contents of the telephone conversations to be disclosed, the Mendes tapes suppressed at trial and the contents excised from the government's applications for electronic surveillance

### III.   CONCLUSION

For all of the reasons set forth in this memorandum and such other reasons as may be advanced at the hearing on the motion this Court should, under the circumstances of this case suppress the contents of Mendes prison calls at trial and excise the contents of those calls from the government affidavit in support of the application for electronic surveillance. Because probable cause for the electronic surveillance does not exist without the prison calls, the fruits of the electronic surveillance orders should be suppressed as well.

Respectfully submitted,
**ON BEHALF OF ALL REMAINING DEFENDANTS**

Dated: April 20, 2005

S/S John H. LaChance
John H. LaChance, Esq.
BBO# 282500
600 Worcester Road
Suite 501
Framingham, MA 01702
Tel:  (508) 879-5730
Fax: (508) 879-2288